v. A. P. S.             S. v. R. v. C. v. P. v. B. v. D. v. J. v. R. v. M. v. R. v. C. v. D. v. J. v.    v.  v. J. v. B. v. P. v. M. v. R. v. D. v. C. v.   M. v. D.    C.     v. M. v. C. v. D. v. R. v. B. v. J. v. M. v. C. v. D. v. R.     v.   C. v. M. v. D. v. J. v. B. v. M. v. C. v. D. v. M. v. M.    D. v. M.  B. v. J. v. M. v. C. v. D. v. B. v. M. v. C. v. M. v. D. v. v.  v. J. v. B. v.  v. J. v.  v. B. v. J. v. M. v. B. v. J. v. D. v. M. v. C. v.   B. v. R. v. J.    L.   v. B. v. J. v. M. v. O. v. J. v. M. v. J. v. Q. The point that Justice Ziaof raised is a determination by the General Assembly that the safeguards with respect to police testing, police recovery, witnessing the drawing of blood and other safeguards that apply to the state do not apply to blood tested in a hospital setting. Do you understand the difference? I do, but disrespectfully in all, the blood was drawn in the hospital. And one of the problems in all…. There's no evidence that anybody witnessed or who witnessed the blood draw, which you have to have for the state police, etc. The court ruled in all that the evidence was taken by the police to be tested at the L.A. State Police Crime Laboratory, correct? The tests were done at the request of law enforcement, is my understanding. The draw was not done at the request of law enforcement. I'm using the word draw to refer to the physical taking of the specimen from Paul. Mr. Paul was in a hospital for a heart problem. They took blood from him with a nurse for medical purposes. The problem that this court had in all had to do with the collection of the sample. It was later tested at a law enforcement laboratory, at the direction of law enforcement. Yes, but 501.2 applied to some drawing and testing. And 501.4 applies as a business record to a hospital because the legislature said the safeguards are there. Because it's not drawn at the request of law enforcement, it's drawn for regular medical testing and the work is done by a lab that's routinely used by a hospital. So it has, indeed, showed reliability because these doctors are relying on these results for life and death. Well, to get into the policy of it, I think that in terms of the past in Mr. Lawson's case, you may recall that, for example, Dr. Lawson called this a rapid screening test. Dr. Lawson did not know what the specific forensic instruments were that was used. So similar to what we see in crime laboratories, the crime laboratories always describe GCMS or whatever the technique was. Hence the reason it's a business records exception. You don't need to bring in all the people that tested it and, you know, tested the GS, the gas chromatograph. I agree. You do not need to bring those people into the trial. But 501.2 refers to both the collection and the testing of the blood. And in all, the problem was that the problems in all had to do with where the blood went into the test tube at the hospital. How do you read that? So that doesn't address 501.2. Right. It's a 501.4 case. Right. I'm sure the state's going to say this is a 501.4 case too. So in fact, it was interesting that in the most reasonable way, it was a stipulated lifestyle, unlike our case. But in fact, it's interesting that the parties called in nurses, they called in experts. 501.2 was most likely satisfied because, for example, in fact, there was a registered nurse who took the biological test. I apologize. But in fact, the registered nurse actually came in and testified and talked about the time it was taken, talked about the doctor ordering it. And so you don't have the same 501.2 concerns. In fact, that is talking about the records being admissible. I am not arguing that these records were not in themselves also admissible. First, you have to go over the phone with 501.2 to satisfy the collection issues and potentially the testing issues. There's no reason for that. So every hospital blood that's done by the hospital, for hospital purposes, somebody's laying there bleeding. We've got to get a quick blood test. We've got to find out what's wrong with this guy. To be offered into evidence in the DUI prosecution, you're saying that then they have to present that need to be done, you know, the colors of the stoppers, who's got to be there, all those regulations in the ISP. I can let the hall say that. Because in hall... Where in hall does it say that? I'm happy to read that to you. In hall, in hall... In hall, the state took the position that the blood was admissible under 0.2, correct? Yes. I think... That's not what... Right. And that's not the argument here. The argument here is that the blood result was admissible as a hospital business record. The result was admissible. So I think hall doesn't... Hall doesn't address the admissibility of documents. Hall addressed 501.2. Right. And 501.2... So in hall... 501.2 does not apply. You're saying that 501.2 has to be complied with in order to introduce the results of medical testing? That's exactly what I'm saying. Where? What authority do you have for that? Hall. In hall, the defendant is moved to the emergency room. He has taken the... We're familiar with the facts of hall. Where in hall does it refer to 11501.4? It does not. Because there's no... Do you want to talk about any of the other issues in your case? Before you go, guys, can I just ask you one question? Do you concede that the requirements of 501.4 were satisfied by Watson's testimony? 501.4. Yes. Yes. I mean, because it's one sentence in. It's one section in. The legislature said it was satisfied as a business record exception. I mean... That is my question. I don't know if I should concede that, Justice. Excuse me. Dr. Watson knew so little. He knew so little about the process. I'm not positing... But the requirements are very simple. The requirements are it's pursuant to regular medical treatment. Yeah. And it's done by a lab that they rely on. Yes. But I think by specifically evoking the business record exception, I think they're triggering all of those foundational requirements in a very broad sense. I'm just not even sure if Watson knew enough about the creation of the documents in terms of their terms. But I think for the most part, 501.2 is the problem here. In all, his blood was taken for medical treatment. And in all, this court said the problem was the collection. So... Okay. In all, they referred to the staffers that the nurse used at the hospital. The fact that they subpoenaed the blood and sent it to the lab later isn't part of the argument here. The problem was the collection. And we know nothing about the collection. We don't. Again, Mr. Reinhart, you probably should move on to your other arguments. Okay. Because I think we've beat this pretty much into the ground. Okay. I guess you can point to something in Hall where Hall was considering admissibility under the hospital business record exception. I don't know why they did. 11501.4 was not an issue in Hall. Correct? Correct. And so because in that case they sent it to a lab outside of the hospital, the focus then is on the collection. In this case, there's no information about the testing. There's no information about the collection. There's no information with respect to the urine or the blood, how the biological samples were taken. And I respectfully disagree and I understand. Isn't that, again, you're going on, but isn't that the whole point of the business records exception that you do not have to bring in the various circumstances that led to the creation of the record that establishes the fact that's on the face of the record. That's the whole point. And the General Assembly, as Justice Perkins pointed out, has decided that those test results are reliable. You don't have to prove all of the circumstances that led up to the result as long as you satisfy the foundational requirements. With respect to the testing results, I think that's correct. But I don't know why we, yes, I think that if the, for example, if the record said that it was collected by a nurse. Does 11501.4 say that there has to be a witness testifying to the drawing of the blood? No, it could be included in the documents. Just as we now have authentication of records through other Illinois Rules of Veterans, you would be able to have the documents say nurse Smith is a registered nurse. She took this item at this time using this type of procedure, using this type of stopper. Those people wouldn't have to walk into court. But 501.2, I think, still has to be satisfied under HALT. With respect to the fair to report an accident, there's no information whatsoever about phone calls that dispatch received or what's called a senton in that area of Lake County. There's no information whatsoever from senton or from dispatch or any information with respect to whether or not Mr. Moss made any phone calls during that time period. Could you just look at whether or not there's a reasonable inference that he made that? Because, I mean, you know, I just don't see this, based on the facts that I'm aware of from reading the record, of this person fleeing a burning truck, running behind a barn, trying to steal another truck, and at the same time calling 911s, reporting an accident. I think that, I certainly think, I understand your question. I think that Judge Strickland talked about whether or not the defense was making any contentions regarding that. I think that, in light of the facts of this case, with both him being injured and with his passenger, Frank, being injured, I think it is possible that somebody would make a phone call to say there's an accident at this intersection and I'm leaving. But I don't think that's possible. I think the fact that he was also shot in the mouth sort of cuts both ways on that. I can't tell you that it's incredibly likely that he was making a phone call since he also was shot through the mouth, but that's why I included so much information in my brief about his medical injuries, not because I was trying to provoke sympathy, but because I was trying to explain his incapacitation. He was not so incapacitated that he could not take another vehicle or try to steal another vehicle, correct? He was found inside of a vehicle and there was blood on the vehicle where he had been. With respect to his hospitalization, I think he being shot in the mouth is a specific factor in this case. Clearly, after the first collision, after he ran into and rammed Mr. Osbarger's vehicle several times, there was clear evidence that he did not comply with the law following that collision, correct? I think he was convicted, yes. It doesn't matter if he was convicted. That evidence was before the jury, correct? He was acquitted on the outside. The evidence was before the jury, correct? Of course. Okay. And it was clear that he just remained with his girlfriend for at least a half hour after that, correct? Yes, but after the Osbarger, I believe that the trial court brought him out of that county because there was no satisfactory testimony regarding Mr. Osbarger's injuries. Right. So the injuries are, we're talking about Picarro and Clark, which is near the farm. We're talking about your client's conduct, not what Mr. Osbarger's injuries were. The clear evidence was he did nothing to attempt to report, to render aid, to make a phone call after that particular collision, correct? Correct. But at that point, his passenger had not been injured. He had not been shot. Doesn't the law still require you to stop at the scene of an accident to inquire? That's the point. Yes, of course. He didn't do any of that, correct? No, he didn't. So can't the jury infer from that conduct that in the subsequent collisions that he was going to engage in the same type of behavior to avoid apprehension and not report what he had done? I think that inference can be made. Okay. I think that the injuries, the situation is different now because you might go to court and ask him where you're injured and where your friend is injured, as opposed to Mr. Osbarger's case, which was earlier in the day. I don't know if the court would like me to take a moment to address the consecutive sentencing. I actually would ask you to succinctly, because I don't know, maybe I'm missing something, but it seems like your arguments sort of shifted a little bit between the white brief and the yellow brief. So I want you to succinctly state what is the consecutive sentencing issue here. The consecutive sentencing issue is that the Class I offense of aggravated unlawful possession of a stolen motor vehicle, which is only a Class I because you're also going to chase it. It's not a Class I because of the injury. The court found that that led to serious bodily injury. It is that same injury that we see in, actually the court only entered a verdict for a sentencing on Mr. Clark's accident. And so it is that same injury that has now led to consecutive sentencing. So as I stated in the brief, and I agree with Justice Linden, I think I just shook my head because I thought more about this in my own analysis, frankly, you have the triggering offense of the Class I causing serious bodily injury, and you don't have another triggering offense. And so the aggravated DUI is based upon the same injury. And I don't think that is appropriate for consecutive sentencing. You have essentially one serious injury caused by misdrives. I don't think that's consecutive sentencing because the aggravated DUI is not a second triggering offense under that list. So many of the consecutive sentence cases that talk about injuries, like in Whitney, in Phelps, in Carney, are talking about second triggering offenses, armed robberies, aggravated discharges, multiple people armed robberies, multiple people murders. So you have multiple triggering offenses down that list, but in this case, we only have the one. So the fair to register, excuse me, the fair to register for an accident does trigger, but it's interesting, right, because it triggers it, it limits it, right, to the DUI. So it is a triggering offense, but it's got a corollary trigger, it's got a secondary trigger. It doesn't, I don't know. Are you aware of the Supreme Court case, Peeble v. Phelps? Yes, sir. Yes, sir. You're saying because there were two triggering offenses in that case, the heinous battery and the aggravated kidnapping? There happen to be two triggering offenses in Phelps. And even though there they said that there's no double enhancement because consecutive sentencing is not an enhancement, that somehow this case is different because the DUI is not a triggering offense? Correct. I think in my reply brief, I referred to the double enhancement. I think, really, as I thought more about Phelps and about Whitney and trying to get a case out of my counsel and Phelps, as I said, I think it's that we don't have a secondary triggering offense on the statute. So you're not arguing anymore a double enhancement, basically? I just think that, I think after reading Phelps, that that language is, that that type of language is rejected. I'm agreeing. I think Phelps rejects that language of double enhancement because of the way it talks about it. It's just a factor. And it's just the manner in which the sentencing can be served. Yes. I agree. Thank you. Thank you. We'll have time for a rebuttal. Thank you so much. Mr. London. Good morning, Your Honors. Counsel. May it please the Court, Richard London, on behalf of the people of the state of Illinois. Your Honor, if I could just very briefly touch on the issue of the hospital reports. In essence, the defense suggestion you just displayed, the two different sections. The people acknowledge that the criteria of 501.2 were not met in this case. But it wasn't met because it wasn't necessary. Let me ask you this. Assuming that we were to agree with counsel's argument, where's the prejudice in this case? Did London drink a half a bottle of rum and snorted cocaine or heroin? I take that back. Heroin, before he went on this escapade, correct? There would be no prejudice, of course. But in addition, there is absolutely, contrary to the defense position, there is no requirement that the, due to the hospital record exception, that there needs to be any testimony. As the exact selection procedures, counsel, the defense asks what type of machines were utilized, you know, who ran them, how the tests were conducted. None of that's necessary.  The doctor explained specifically that they used urine samples in some of these cases versus blood. The reason they could get the urine samples back almost immediately, so they've done it about 2,400 times a year, so that's almost 20,000 times since he has been the chief of trauma and happened to be the physician on call. That evening, testified that they've been accurate and he uses that to assess, says if the blood, if they used the blood samples, that would have to be sent out, wouldn't, of course, be the lab, and then that would trigger the ISP requirement. They don't do that for the exact reason that they want to administer immediate care. You comment on the counsel's argument on the consecutive sentencing, that since aggravated DUI is not a second triggering offense for consecutive sentencing, that you can't use the same injury to enhance the PSMD and the DUI? Well, actually, the judge didn't use the same injury. He used the same accident, but specifically said, if you look at his discussion, his lengthy discussion on sentencing, and said in addition to Mr. Clark's injury, as a result of DUI, Ms. Pecoraro was also significantly injured. She was, and the defendant was found guilty of that, but, of course, the court properly merged the charges. So the trial judge said, I'm using Pecoraro's injury. I'm not using Clark's to double enhance, which, again, arguably speaking, I still think Phelps would arguably apply. Let's say there was no Ms. Pecoraro in this case. Could he have used Phelps by itself? Yeah, Clark's injury by itself. I guess I could almost stop there. The question is, could he have used Zotts? Because Zotts was also injured as part of it. His underage, not only girlfriend, but the mother of his child, who he left fleeing. He left in a burning automobile. That question really gets to the importance of Phelps, and whether or not Phelps, if there was only one victim in this case. I believe Phelps says it's still okay, because it is not a double enhancement or sentencing enhancement. It is merely the way the sentence will be served. So, yes, even under Phelps, assuming there was no Zotts, and assuming there was no Pecoraro, yes, I believe they still could have just used Clark's. I believe Phelps was pretty fair. I have to acknowledge I didn't cite Phelps, but the defense counsel did, and, of course, this court has asked that, and I was going to reference it this morning as well. Heading to the first issue. If you look at the evidence in the light most favorable to the people, there is no question that the people presented sufficient evidence through the testimony of both Bostles and McNeil, who said, I'm not aware of any calls that was made or any effort that was made by defendants. We always have the opposite, where a defendant claims, you know, the police are supposed to know everything that's going on. Well, here in the case, we assume that McNeil, who testified that he reviewed other reports, was in constant, you know, on the radio seeing what was going on, that there was no heated here. Is that definitive? No. But combined with... There was no traffic indicating... There was no traffic indicating that he had, and combined with the reasonable inferences, both before and after. Because we didn't just have a single incident where he fled. We had an ongoing course of conduct where he was chased, had the first accident, no evidence of a report. He turned over that car, apparently, at least from the record, not sustaining injuries to himself or Ms. Ott. What about the injury that he sustained after that, where he, when he went into the roadblock and then was shot in the face by the officer, so he was not incapacitated then? No, he was certainly not incapacitated. Was he injured? Unquestionably. Well, how could he have called... I mean, apparently he wasn't able to speak. Ms. Ott testified too. Ms. Ott specifically testified that we, after evading that scene, and hitting numerous... It wasn't just... I mean, the one gentleman, Ash Fockerwood, was hurt, but the other squad cars were also impacted. Police officers diving out of the way. Testimony that the police officers, before they set up the roadblock, were moving their cars out of the way because he was, you know, charging towards them. But even after Ash Fockerwood, yes, he was shot. Do I have my dispute? He was injured? Of course not. You know, I don't care how minimal the gunshot might have been. He was clearly injured. But Ms. Ott testified that after that, they drove somewhere for about five minutes, then went to a neighborhood and sat there for 30 minutes, and he said, he didn't sign, he didn't, you know, text her. He said, let's go back to your house. Then when he saw police waiting there, and I don't know who was part of this case or just saw police, then he takes off again. So he was not incapacitated. And as far as the concept of incapacitation, after the third accident, but the one with Pecoraro and Clark, the testimony is that it's somewhere between 10 to 15, maybe 20 seconds after the police leave sight of the defendant going around the curb, and they slow down a little bit because they know there's a dangerous curb. Then they hear a crash and there's fog and debris scattered all over. He's so incapacitated, he's able in that 10 or 15 seconds to not only exit the car, again abandoning his girlfriend, mother of this child in a flaming car, but he's able to not only get out of the car, but get out of sight of any police officers.  He's injured. He's probably, I don't think it's unreasonable to speculate, he's probably injured further from the accident. We know he was bleeding. We know he was clearly bleeding. I believe it was. The record indicates he was bleeding from his mouth. The record says he was bleeding. It seemed to be more from the head and neck area, but there was blood all over, there was blood on his arms. There was some testimony that even though he had started the vehicle, he may have had difficulty shifting. Again, I don't know. I don't drive trucks. I don't use a shift. I don't know how difficult a dump truck is as opposed to like a regular car shift. So there's at least, it could be speculated, and I'm not using that as evidence, but that his arm was injured as well. So was he injured? Yes. Was he bleeding? Yes. Was he incapacitated? If he was incapacitated, he would have been left in the car and had to be dragged out as his girlfriend was. He would not have been able to escape, travel at least a half a mile, the testimony is, to where the barn was, and do so without being spotted by police, who arguably are only 10 or 15 seconds behind. So that, to me, is not the definition of incapacitation. So you're saying that this incapacitation and hospitalization, any grace period based on that, is not applicable, or not available to us. Correct. It's not, because it wasn't instantaneous. It has to be incapacitated and hospitalized. You don't know the exact time frame. There's nothing you can do with that that's not in the record. So I don't know the exact time frame from the accident until when he was arrested and put in the ambulance. We know that the accident took place at 12.35 a.m. Yes, correct. Officer Pavlenian testified at 13.17. The prosecutor called his attention to the fact that he was working as a Lake County Deputy Sheriff at approximately 1.20 a.m., and he was dispatched to try and find this guy. And I'm assuming he didn't find him before he was dispatched. He probably found him after he was dispatched. So we're talking about between 12.35 and 1.20. Okay. I wish I had found that. That would have been real helpful for my analysis. Pass his message to the staff, read the record. Yes. Well, I have. I have read the record. I did catch it. So yes, that would obviously only help. But I'm suggesting that there was unquestionably a period of time, because we do have testimony of the individuals in the adjoining house to the barn, that they heard the noise, that there was approximately 10 minutes in between, when they said, wait a second, there's more going on. Now there's police presence. So yes, there was unquestionably a period of time. The only way that the defense really argues that, well, there could have been or there might have been, is trying to reestablish a reasonable hypothesis of innocence. Wouldn't it have been easier for, instead of relying on inferences from the defendant's behaviors, to just have the 911 dispatcher come in, whoever was on call, or have somebody sit and listen to the tape covering that period of time to show that there was no 911 call? Wouldn't it have been easier? Sure. But as I always respond when that type of question is asked, would I have suggested differently if in our capacity as advice to have done that? Yes. Yes. It would have been preferred. Is it necessary? No. But the defense goes a step further. They imply we should have basically called all of the police officers we should have called, and they specifically mention, and even though I live in Lake, I'm not really sure about the 911 dispatch system, but the defense suggests they should have called the dispatchers from each of the different villages. So at least there's an implication that maybe it isn't a unified system. So in his opening brief, the defendant argues they should have called the dispatchers from Round Lake, from here, from here. So again, could we have called 10 or 15 different people to say the same thing that McNeil testified to, combined with the inferences? Yes, we could have. Would it have been preferred to call at least one of the dispatchers? Probably. Is it necessary? No. He's entitled to a fair, not a perfect trial, and the evidence was more than sufficient with McNeil's testimony and the reasonable inferences to be drawn. The only way you could find difference is to basically say, yeah, we're going to accept or reinvigorate a reasonable hypothesis of innocence, and go back and say, well, couldn't it have? There was never any suggestion, and the judge who sat on all the pre-trial motions, as well as heard the evidence that was before the final effect, said, I see nothing to suggest otherwise. Does that improperly shift the burden? No. Because once a reasonable inference and the sufficient evidence is established, the defendant can choose, he's not required, he can choose to attempt to rebut that reasonable inference and evidence. He chose not to. For that reason, no. And we ask this Court to affirm the convictions and sentences. Thank you. Thank you. Mr. Reinhart, rebuttal. Thank you. With respect to the last argument the counsel has made, I apologize, I don't recall. On page 24 of my initial brief, I talk about calling the 9-1-1 dispatcher. The problem in the trial, with respect to this count, was that there was inadequate testimony from Officer McNeil about whether he would know that type of information. The defense specifically objected to that in the middle of the trial, contemporaneously said that there's no foundation that he would know this type of evidence, or that he would have heard that type of dispatch. And the importance of the multiple agencies only goes to McNeil's confidence as a witness on that point, not suggesting that 20 dispatchers needed to be called. But the fact that McNeil is from a different agency means he might not have heard a call to a different agency. The defense is never arguing that every dispatcher has to be called. Perhaps it was only one or two more questions to McNeil, but they were important questions, because McNeil needed to be able to establish that is the type of information I would hear. Isn't it, if you have called, assuming that your client may be in that interim after the final collision, and as Justice Burke pointed out, there is in the record that 40 or so minute gap until the dispatch has gone out to look for him, assuming that he had made a call, why would he leave from where he was at and try to flee again if he was calling for help for his own injury or calling to report the injury? Well, certainly he could have been calling for himself. He couldn't have known that other people were injured. He could be balancing for himself his own injuries versus his criminal liability, but certainly when other people are, I think it was a solo person accident. Which goes to counsel's argument that the reasonable inference was there. You had an opportunity, the client had an opportunity to rebut the inference, and you didn't. Certainly not, but I don't think it was confident evidence that there wasn't a phone call there. I certainly, it was not, he did not testify. He certainly is facing multiple charges. He certainly has a lot of different things going on in his life, but he did not testify on that point to establish that there was a phone call. The last point I want to make on this is that I think the deputy, I don't know if I'm saying his name right, I think that was when he was dispatched. I believe there were, because of the testimony we have from the people on the farm nearby, I think with the sound of the explosion and the seriousness of the accident, and plus McNeil and the second officer are right behind him, right? People are already underway. Yeah, I think that, yeah, so I don't know that it was 40 minutes before he was dispatched, but it may have been 40 minutes before he was arrested. Just to be clear about that. There's also no information about what happened after his discharge. Certainly the inference, I think the information in the record is that he was arrested, but there's no information whatsoever about his discharge. 401D does also give that department a provision regarding giving you some time after a hospitalization. With respect to his incapacity, Dr. Watson did testify that there was a transstacial gunshot wound. That's a direct quote. And so it wasn't just that there was blood around his mouth. I mean, Watson said it was a transstacial gunshot wound. I'm not aware of whether or not you can report an accident in any other way with respect to testing, but I think you need your voice. Well, didn't you see the movie Fargo? I did see the movie Fargo. Yeah, I think we can picture that. He was talking up a storm after he was shot. True, true. And let me ask you this about the hospital blood issue. Yes. There was no issue with respect to how much alcohol that kind of was there? I mean, he drank a half bottle of rum and snorted heroin. No verdict was returned on whether or not he was having the incidents. No verdict form came back into the jury room. I don't recall whether or not a verdict form wasn't sent back or whether there was no verdict that was returned into the courtroom. But with respect to whether he was under the influence, which I think is A-2, no actual verdict was returned on that. So I think that there is prejudice because he was only convicted on A-6 counts. On the A-1 per se. Yes, I'm sorry. He was convicted on the per se, which is the amount of alcohol, but also on the A-6 counts with respect to the cocaine and the heroin and the marijuana. So he certainly has prejudice on that. Certainly if the jury that was considering all of the factors had not heard that testimony about whether he had cocaine and heroin in his system, that could have also assisted while he had the charges. But he doesn't have prejudice with respect to the per se under A-1 and the A-6 counts. So I think that the last time I think I went up about 501.2 and 501-4 is that even though the statutes are in tension, I don't think there is a statutory exception under 501.2 for a hospital sentence. All right. Thank you. Thank you. The Court thanks both parties for the quality of their arguments this morning. The case will be taken under advisement. The written decision will be issued in due course. Thank you. Thank you. Thank you. Thank you. Thank you. Yes, sir. Yes, please. Yes, sir. Sorry. Yes. Yes. Yes. Yes, sir. Yes, sir. Yes, sir. Yes, sir. Yes, sir. Yes. Yes, sir. [...] So you're using it only for that part, is that right? Yes, ma'am. There, the court also found that there were allegations of negligence that were separate and apart from the claims of unreasonableness of fee. So here, you don't have that either. Basically, in paragraph 11, you allege, for reasons set forth below, police, and this is just with regard to one defendant, breached his agreement, both oral and in writing, through the charging of clearly excessive fees. That's really all that's alleged, and that's the gist of the complaint. I'm sorry, that is the gist of the complaint. So that, too, is different than Weisman. Yes. However, Weisman stands to the principle that she's entitled to a jury that haven't even had a term. I don't think there are other cases that say the same thing. We maintain that the terms of the contract, the terms of every contract, even the rules of professional conduct, specify that fees must be reasonable and, if necessary, work only. And that's a determination that the divorce judge can make, correct, in the 508 petition? Divorce court could make that determination. Yes. And you agree that the standard of review, or our standard of review, for the granting of 2619A3 is abuse of discretion? Yes. Where is the abuse of discretion here? I'm sorry, sir? Where is the abuse of discretion by Judge Souter? I think the abuse of discretion occurs rather when she's deprived of that right to a jury. You don't argue anything about Judge Souter's ruling that was an abuse of discretion? No. I think without saying those particular words, what we do say is that he's just deprived us of our rights. And that's the abuse of discretion. That's a conclusion. That's not an argument. I thought it was. Look at the factors in 2619A3. Where did the trial court abuse its discretion in examining the factors in granting the motion? We believe that the abuse of discretion occurred when he deprived us of the right to a jury based on the fact that it was already a petition for fees that made it a 508. And it's really not a question of whether or not the divorce court could do as good of a job or could have the same result. It's just the right that we have to present our case to a jury. You would agree that the legislature took that right away in the 508C petition, right? I mean, you do not have the right to have a jury in a 508C petition. No, that's absolutely correct. So you're saying that by filing an entirely duplicative complaint in the law division, that gives you magically this right, instead of having a judge decide it in 508, to have a jury decide it. I hope you agree with me on that statement. And that's your argument? Yes, it is. With that said, I really have nothing further if you have more questions. Thank you. Ms. Hamill. Good morning, Mr. Chairman. May it please the court. This case is about ensuring consistency within the court and adhering to the legislature's specific directive in Section 508. In this case, the trial court correctly determined that a plaintiff accepting the breach of contract claim was completely deplicative of the already pending 508C petition to dismiss the repression. This really boils down to this jury trial issue. Basically, my last question then was, if you could file a totally duplicative petition in the law division, and because you have the right to have a jury in a law division case for breach of contract, then you should have that right in a 508C petition. I don't believe you have the right to a jury trial when it comes to the determination of whether fees are reasonable or expected in a family law case. I think that's what the legislature did in Section 508. Examining the actual statute, which is why we included it in our brief, because we think it's important. Really, the reasoning behind the legislature implementing that is that it wanted to streamline the process for family law attorneys to resolve these fees both with their clients or when they're seeking contribution from other parties, and to really decrease the amount of litigation. In an effort to avoid having attorneys file breach of contract claims against their clients for unpaid fees, or having clients file breach of contract claims against their attorneys for fees that they deem to be too excessive, the legislature wanted to streamline that process and had everything heard before the divorce court, before the trial judge, who they deemed was in the best possible position to determine whether those fees were fair, reasonable, or necessary, because they fundamentally decided it was a full matter. Section 508 specifically states that the adjudication of these fees between family law attorneys and their clients are best held by that trial court, for the reasons I just stated. And it further states that the trial court may also sustain all fees in the aggregate, with all of the billings included, and examine all of the evidence, including evidence of what the other side's attorney charged, to determine whether that amount was fair and reasonable. Section 501 does permit disgorgement of fees already paid, and the Illinois Supreme Court, in the case we cited in remarriage for early warnings, did find that the trial court had the jurisdiction and the ability to order disgorgement of fees that had already been paid, when they found that the fees charged were inappropriate. The issue really then would be whether those fees had been earned. And if it turns out that the fees were improperly put against the client, then they were not earned under the cases that followed earlier. That's correct, and then they would be subject to that same disgorgement. So in this case, the plaintiff, in her complaint, alleged that she wanted a return of $10,000, and finding that she doesn't owe the balance of fees to police, and that his, I believe it was $150,000, may be seeking an additional fee. Under early warnings, the Supreme Court said that the trial court had the jurisdiction and the ability to examine all of the fees that had been charged or being sought, and determine what amount, if any, was appropriate. So if the trial court decided that, you know what, Mr. Felice, I've looked at the billing, I've looked at all the evidence, I've been the one in the best position to determine whether this case is really generating those types of fees, he could award, he or she could award any amount of those fees or disgorge them. But the legislature is pretty clear that Section 508 says that those determinations should be made by the trial court in the divorce proceeding, and not court. If, for example, in this case, where we have a DuPage divorce, the plaintiff went ahead and filed a breach of contract claim in Cook County, and we had to then get it transferred to DuPage Finance and make the Cook County judge bring it back to DuPage. I think that's exactly what the legislature is trying to avoid. They didn't want to have family law disputes that are being litigated in one county, then spawn additional litigation that could potentially be in other counties, which could then also result in not only duplicative litigation, which is against the principles of judicial economy, but more importantly, it could threaten incredible inconsistency. For example, if you have a fee petition pending in DuPage County, which is what we have, and that judge is going to determine the fairness and reasonableness of Mr. Felice's fees and Ms. Gannett's fees, what if that judge determines, okay, this amount is fair and reasonable, but then you have a Cook County court or even a jury in DuPage County say, wait a minute, I think divorce attorneys charge way too much money, that's ridiculous, that's a breach of contract, and now you have two completely different and very inconsistent findings. Do you read Weisman as somehow trumping this? Basically, the jury, right to a jury trial trumps everything that you spoke about with Section 508? I don't. Weisman is, as we mentioned before, a registry narcotics case, number one, but number two, and more importantly, Weisman was an illegal malpractice case in the sense that the plaintiff specifically alleged that the attorney committed malpractice in failing to fully investigate the full nature and extent of the marital estate, that the attorney was negligent in the way that they were handling other aspects of discovery, and that those negligent acts approximately caused the plaintiff to receive a lesser proportion of the marital estate than she would have received otherwise. That is absolutely a jury case. Illegal malpractice cases are tried before juries. We have a right to have a jury adjudicate those claims. We have expert testimony where you have people come in and say a typical divorce attorney in that case would have done the discovery, and that would have led to a different outcome. So in Weisman, it was not primarily an issue of excessive fees, whereas in this case and in Bennett, which is what the House correctly relies on, it was just an issue of was the fee excessive for the representation that was delivered. So I don't see Weisman as talking any of the arguments here because it is so distinguishable. In this case, there were absolutely no allegations that Mr. Police did anything wrong or committed any sort of negligent acts that approximately caused the plaintiff to receive anything less. Instead, the only allegation was that Mr. Police and Ms. Gaynor charged too much money, and that was it, which is really within the full purview of Section 508. There is simply no case law in Illinois that a plaintiff is entitled to a jury trial simply for believing that she was overbilled in her divorce proceedings. Again, if you look at the factors that were outlined by the Supreme Court in the early lines and then talk about the six factors that the court is required to examine to determine the fairness and reasonableness of the case, which I know you're just as familiar with that, but the difficulty of issues and the subject matter in the field of family law and the degree of responsibility involved in the management of the case and the usual and customary charge to the community, the benefits to the client, those are all from in-range marriage and child. All those factors, the legislation determined and the court determined, were really best to be decided by the judge presiding over that part of the case, which is the purpose of 508, and which is why I believe the trial court was correct in dismissing this claim as duplicative and saying all these things should be resolved through the already pending suit. Thank you. Thank you, Judge. All right. Mr. Voter. I have no interest in reiterating any of the very articulate and I believe complete commentary offered by our co-appellee's counsel, Ms. Hamilton. I would like to point one thing out relative to the Weitzman case. You know, we don't know what the answer would have been in Weitzman had the court addressed the issue that we're presented with here. In other words, when the matter was being sent back down, would the plaintiff in that case be able to relitigate the issue as to reasonableness of the case? It's not clear from the opinion whether that was an issue that was raised in the plaintiffs. It's not clear whether that's a damage that the plaintiff would have thought of. I mean, do they have a jury beside an issue of legal fees? Do you have any authority for that? I mean, is there any authority that you're aware of that that is a subject matter for a jury's determination? There is none that I'm aware of, certainly not in this context, where the legislature has specifically articulated a statutory basis for this issue to be determined upon the discretion of the divorce claim. And there's no claim of negligence anywhere in the complaint, correct? Not in the complaint that we're dealing with here today. There was, obviously, in Weitzman. In this complaint, it's a breach of contract claim. It's pled as such. It's always been articulated and argued as such. I think that had the Weitzman case in court addressed the issues that we have here today, even in the res judicata context, even in the legal malpractice context, even under the de novo standards that it was acting under, I think that it would have reached the conclusion that I think should be reached here, which is that those particular issues, the issues of reasonableness of fees, either that were or were not paid, would have been res judicata, even under a much more stringent standard applied in that case. I think very clearly the fee position involved the same cause as in the breach of contract case. In fact, I think the Weitzman case actually stands for that proposition in a way, dealing with somewhat different standards, but very similar standards. Weitzman said it was the same cause. It met all the standards of res judicata, but it said that because of these two things, the jury trial issue and not being able to get damages for legal malpractice, we're not going to hold res judicata into a court. They said exactly that. They said that there were identity of causes of action, which is the standard in a res judicata case, and it is nearly identical to the standard in a 619-83 case. In fact, I think, again, it's a more stringent standard to determine that they were identical causes of action. There was an identity of causes of action. So I think that the Weitzman case concluded consistently, certainly, with what Judge Sudo concluded here. So to argue that the Weitzman case stands for the proposition that Judge Sudo abused his discretion, I don't think that it's based on a full reading of the Weitzman case. I'm happy to answer any of your questions, but I don't mean to belabor you. No, that's all right. Thank you very much. Thank you. Thank you. Mr. Guthrie-Buttle. If you accept the premise that legal malpractice is based on breach of contract, then what flows from that is that charging excessive fees breaches the attorney-client contract and constitutes malpractice. And I think if you accept those premises that she has the absolute right for proceeding as she did, it's a common law cause of action. Let me ask you this. If this case, if you were correct, how would you prove a breach? What's negligent? What's the malpractice? If given the opportunity, we would present an expert who would opine that the charging of unreasonable legal fees, excessive legal fees, or fees for unnecessary work constitutes malpractice. And I think we should be given that opportunity. Maybe the jury will find that. And therefore, what is the relief that you would be asking? From you? From this court? Are we demanding that at the trial? No, no, not from us. You were saying, if you would go ahead and allege that. You know, I hate to admit it, but I love my hearing aids. Well, that's okay. Let me talk about it. So you were just describing the lawsuit? Yes. Okay. So what is the relief that you would request in that lawsuit? What type of relief for the return, the disgorgement? Yes. You would not be asking for any other damages? So isn't that identity of the causes of action with respect to the excessiveness of fees that you were talking about earlier? If it weren't for the Constitution, there's no question that it would all be handled in divorce court. But if it's a common law action and we have a right to that jury trial, I would be paying. So, I mean, taking your theory to the next level, which somewhat happened in this case, I mean, I could have a client who doesn't want to pay his or her legal fees and moves to maybe Moultrie County or something, and then files a lawsuit in Moultrie County saying that this guy charged you $500 an hour up in DuPage is outrageous. Because in Moultrie County, that might be outrageous. So, basically, you're opening the door to that for every fee petition anyway, right? Is that what we're talking about? No, I don't think so. But the converse of that argument is to say, by not giving her her jury, we're closing the door on a constitutional right and forcing everybody to go to divorce court. Well, we're not closing it, the legislature did. I mean, I agree with you that it's difficult to come to grips with the statute as opposed to the Constitution. But she has changed the Constitution to let her have her right to a jury in a covenant action. Nobody says that 508 granted an exclusive right to every divorce judge just to hear all fee petitions. I mean, it's kind of a race to the courthouse to see who can get on file first. But, you know, in other cases, there's already been a hearing, and then they try to come back in another case. This one is not solved. Now, in a practical matter, if you had jury boxes in divorce courtrooms, just as a judge under the Code of Civil Procedures can rule on what we used to call equitable issues, a jury can hear the legal issues at the same time. That would be a resolution. Do you have a case where a plaintiff has been entitled to a right to a jury trial and divorce fees? I have cases that say, and we've cited them, not specifically divorce fees. No, sir. What we do with the cases is a common law remnant. A breach of contract is a common law remnant. And the Constitution gives the right to a jury trial for constitutional, or I'll strike that, for common law remnants. Having sat in divorce court, I can tell you that opening up any issues to a jury in divorce court can be very interesting. Oh, that's true. I think that's probably why they're giving it to you. My thought would be that what the jury was hearing was the law division case, not the divorce case. And the judge would sit there and hear those equitable issues. But, yes, I can certainly agree that juries in divorce trials do a good thing in general. Thank you very much. I thank all three parties for their arguments today. The court will take the case under advisement. A written decision will be issued in due course. The court stands adjourned. Thank you.